UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA MAHONEY on behalf of
PATRICK GRAY,

       Plaintiff,                        Case No. 2:23-cv-11672

v.                                        Honorable Susan K. DeClercq
                                            United States District Judge

WALBRIDGE ALDINGER, LLC,

       Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 81) AND DENYING AS MOOT
PLAINTIFF'S MOTION FOR COURT-SUPERVISED NOTICE OF
COLLECTIVE ACTION (ECF No. 77)**

In this case, former-Plaintiff Patrick Gray brought a collection action lawsuit under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203 *et seq.*, to recover allegedly unpaid overtime wages from his employer, Defendant Walbridge Aldinger, LLC. Upon Gray's death, his surviving wife and personal representative of his estate, Paula Mahoney, became the named plaintiff. Walbridge now moves for summary judgment, arguing that Gray was correctly classified as exempt from time-and-a-half overtime pay. For the reasons provided below, this Court will grant the motion.

# I. BACKGROUND

## A. Walbridge's Employment Practices

### 1. The Safety Engineer Position

Defendant Walbridge Aldinger, LLC ("Walbridge") is a comprehensive construction-services company that manages the safety and development of customers' projects. ECF No. 81-5 at PageID.2934–35. To provide its services, Walbridge's Health, Safety & Environment Division employs safety engineers to who interface with customers and ensure that the customer's construction projects are completed safely. *See id.* at PageID.2934, 2937; *see also* ECF No. 81-2 at PageID.2843. Most commonly, safety engineers perform audits and "safety orientations with new subcontractor employees that come on to the project, administer[] disciplinary action," provide recognition and awards, coach subcontractors, investigate job-site incidents, and hold meetings. ECF Nos. 8-5 at 2937, 2940, 2942–45; 81-10. Depending on the project, Walbridge sometimes has only one safety engineer at a job site. *See* ECF Nos. 81-2 at PageID.2838; 82-5 at PageID.2961. Safety engineers with more experience or qualifications can be promoted to senior status, but the duties are essentially the same. *See id.* at PageID.2844, 2848.

### 2. Employee Classification

As part of Walbridge's administrative hiring process, Walbridge conducts an

internal approval process of a potential employee's "pink sheet," which is "a single page [that] lists the job candidate's name, the position title, who the manger's going to be, which project they're going to be assigned to; it lists their salary." ECF No. 81-6 at PageID.3003. The pink sheet also lists whether an employee would be classified as exempt from time-and-a-half overtime pay. *Id.*

To determine whether a potential employee would be exempt from time-and-a-half overtime pay, Walbridge's Human Resources (HR) Department personnel review the Department of Labor's Guidelines, assess the particular job description, and consider the position's responsibilities to make a collaborative decision. ECF Nos. 81-6 at PageID.3000; 81-3 at PageID.2891–92, 2906–08.

### 3. Timekeeping and Payroll

When a full-time, salaried employee is hired, the employee is expected to record 40 hours of regular work each week in Walbridge's timesheet system. *See* ECF Nos. 81-2 at PageID.2859–61; 81-3 at PageID.2894. Walbridge's payroll employees make sure that salaried employees' timesheets reflected consistent pay of at least the minimum of eight hours a day for five regular work days, such that if an employee did not "work or if they worked for a half day for whatever reason…payroll would apply that difference to their time to make sure they were brought up to 8 hours." ECF No. 81-3 at PageID.2894. For construction projects with contracts that permit overtime pay, some salaried employees may record any

additional hours over 40 to receive straight time overtime (STOT) pay. *Id.* at PageID.2895–96, 2900; ECF No. 81-6 at PageID.3015. The STOT hourly payrate is calculated by dividing the employee's annual salary by 2,080—the number of hours in a year at full-time employment. *Id.* at PageID.2895; *see also* ECF Nos. 81-2 at PageID.2866; 81-4 at PageID.2922. Pay periods and paydays are biweekly, thereby reflecting 80 hours of regular work for each period. *See* ECF Nos. 81-4 at PageID.2925, 2928; 81-12 (explaining Walbridge's payroll procedures).

### B. Gray's Employment

In March 2008, Walbridge hired former-Plaintiff Patrick Gray to be a safety engineer. *See* ECF Nos. 81-6 at PageID.3003; 81-2 at PageID.2838. The "compensation" section of Gray's pink sheet showed that he would be full-time with an annual salary of $62,000 and exemption status. ECF No. 81-9 at PageID.3115. In Gray's offer letter, Walbridge offered Gray an annual salary of $62,000 with annual salary reviews. ECF No. 81-8 at PageID.3112. Gray accepted the offer by signing the letter. *Id.* at PageID.3113.

Gray was later promoted to senior safety engineer.[1] ECF No. 81-2 at

---

[1] Gray testified that he was not aware of any other offer letters or pink sheets beyond the ones created in 2008. ECF No. 81-2 at PageID.2872. Assistant Vice President of HR Christina Collins and Assistant Vice President of Human Capital Richard Krout confirmed that employees receive verbal communications about raises and do not receive any documentation about new raises. ECF Nos. 81-6 at PageID.3007; 81-3 at PageID.2896–97, 2899 ("We would not issue another offer letter…if his salary

PageID.2828. However, his duties continued to be "implementing and maintaining project Safety & Health policies onsite for the construction manager, all subcontractors and other stakeholders[;]…conduct[ing] safety orientations, meetings, and inspections;…interface[ing] with management from the subcontractors"; answering customer questions; performing audits; developing "and implementing emergency response plans"; and solving complex, on-site safety problems. *Id.* at PageID.2844–50; *see also* ECF No. 81-10.

"As a rule," Gray recorded a daily minimum of eight hours on his timesheets. ECF Nos. 81-2 at PageID.2859–61; 81-3 at PageID.2894. He also recorded overtime hours when permitted—the STOT payrate for which was calculated by dividing his salary by 2,080. ECF Nos. 81-2 at PageID.2866; 81-3 at PageID.2895 (dividing $62,000 by the value of 40 hours in a workweek, times 52 weeks in a year, *i.e.*, 2,080).

Based on this same calculation method, Gray's salary was approximately

---

increased."). Because Gray was not fired and rehired during his time working for Walbridge, his classification as a salaried, exempt employee—as reflected in these documents—would not have changed, absent some change in company policy. *See Venema v. Bode*, No. 1:23-cv-316, 2025 WL 1588678, at *1 (W.D. Mich. June 9, 2025) (finding that "the granular details [of the plaintiff's promotions] are immaterial for the Court's purposes because [the plaintiff's] responsibilities were nearly identical in these salaried roles"); *see also Sutka v. Yazaki N. Amer. Inc.*, No. 256 F. Supp. 3d 677, 679 (E.D. Mich. 2017) (addressing whether a new policy that changed resident engineers from hourly employees to salaried and exempt was lawful under the FLSA). Accordingly, Gray's promotion and raises are not reflected in this document, but his salaried, exempt classification was consistent throughout.

$85,000 by July 2020, with his STOT payrate at approximately $41.11. *See* ECF No. 84-6 at PageID.3695. And by July 2021, his salary had increased to approximately $87,500, with his STOT payrate at approximately $42.10. *See id.* at PageID.3661. For the weeks that Gray was not on leave in 2021, his pay stubs and timesheets show that he was paid for an average of 46 hours each week for 40 regular hours plus STOT. *See* ECF No. 81-4. But beginning in the fall of 2021[2] and continuing through February 2022, Gray was on leave under the Family Medical Leave Act (FLMA). ECF Nos. 81-2 at PageID.2863–64; 87-1. By April 2022, Gray stopped working for Walbridge. *See* ECF Nos. 81-11 at PageID.3119; 1 at PageID.2; 9 at PageID.38.

## C. Procedural History

On July 12, 2023,[3] Gray filed a collective action against Walbridge, alleging

---

[2] There is some discrepancy in the record as to when Gray's FLMA leave began. *See* ECF Nos. 81-2 at PageID.2863 ("I did not work after November 30th of 2021"); *and* 87-1 at PageID.4030–40; but *see* ECF No. 81-2 at PageID.2864 (confirming that Gray was on FLMA "for the period September 29, 2021 through…February 22, 2022").

[3] Under 29 U.S.C. § 255(a), "[a]n FLSA plaintiff generally has two years to file suit, but the statute of limitations increases to three years if the claim consists of a 'willful violation.'" *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012). "An FLSA cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Id.* (internal quotation marks and citations omitted). Because Gray alleged that Walbridge willfully violated the FLSA, the maximum timeframe of Gray's employment for this Court's consideration is from July 2020 through April 2022. *See id.*; *see also Sutka v. Yazaki N. Amer. Inc.*, No. 17-10669, 2018 WL 1244767, at *1 n. 1 (E.D. Mich. Mar. 12, 2018).

that Walbridge willfully violated the FLSA by misclassifying him as exempt from time-and-a-half for overtime pay and making improper deductions. *See* ECF No. 1. He also moved for court-supervised notice of the collective action for similarly situated employees, ECF No. 7, which Walbridge opposed, ECF No. 80.

In July 2025, Walbridge moved for summary judgment, arguing that Gray was properly classified as a salaried employee under the FLSA's administrative exemption, did not experience improper wage deductions, and was therefore not entitled to time-and-a-half overtime pay. *See* ECF No. 81. Plaintiff responded that Gray's duties were not administrative and that under recent precedent, Gray was effectively an hourly employee because his weekly "salary" was not reflective of his normal workweek. *See* ECF No. 84. Walbridge disagreed. ECF No 87.

## II. LEGAL STANDARD

To prevail on summary judgment, a movant must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to

---

Accordingly, this Court relies on the version of the FLSA that was effective from January 1, 2020 through June 30, 2024. And because, as explained below, this Court will grant the motion for summary judgment, it does not need to address whether there was sufficient evidence to show that the alleged violation was willful. Instead, this Court has considered the broad possible timeframe to view the evidence in a light most favorable to Plaintiff in order to find that there is no dispute of fact that Gray was properly exempt under the FLSA. *See Anderson*, 477 U.S. at 251–52. This Court further notes that although Walbridge was required to produce Gray's employment records from 2018 onward in an earlier order, the parties understand that the statute of limitations preclude any damages from before July 12, 2020. ECF No. 81-7 at PageID.3098. *See also* ECF Nos. 26; 29 at PageID.440.

judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 252, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52. Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

## III. DISCUSSION

The purpose of the FLSA is to "protect all covered workers from substandard and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 7238, 739 (1981). "Among other requirements, the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Christopher v. SmithKline Beecham Corp.*, 567 U.S.

142, 147 (2012) (citing 29 U.S.C. § 207(a)). "However, the statute exempts from the overtime pay requirement 'any employee employed in a bona fide executive, administrative, or professional capacity.'" *Tooker v. BlueJay Solutions, Inc.* 715 F. Supp. 3d 1022, 1027 (W.D. Mich. 2024) (quoting 29 U.S.C. § 213(a)(1)). "The employer has the burden of proving that an employee satisfies any exemptions under the FLSA, and exemptions under the FLSA are narrowly construed against the employer." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 837 (6th Cir. 2002).

Walbridge argues that Gray was exempt for time-and-a-half overtime pay as "a bona fide administrative employee" because Gray received a guaranteed annual salary—not subject to deductions based on the quality or quantity of his work—and his duties were primarily administrative. ECF Nos. 81 at PageID.2802–14; 87 at PageID.4027–28. Plaintiff asserts that Gray was paid an hourly rate because his average workweek exceeded 40 hours, his pay was subject to deductions because he did not receive full wages for one pay period in 2020, and his duties were not discretionary because he was required to follow Walbridge's strict policies. ECF No. 84 at PageID.3298–312. For the reasons provided below, this Court finds that there is no dispute of fact that Gray was properly classified as an exempt employee.

To determine whether an employee qualifies as exempt, courts consider three tests: the salary-basis test, the salary level test, and the duties test. *Helix Energy Sols.*

*Grp., Inc. v. Hewitt*, 598 U.S. 39, 44–45 (2023). First, under the salary-basis test, an exempt employee under § 213(a)(1) is an employee whose compensation is guaranteed, *i.e.*, "a predetermined and fixed salary"—one that does not vary with the precise amount of time [the employee] works." *Id.* at 45 (citing 84 Fed. Reg. 51230 (2019)). Second, the salary level test "asks whether that present salary exceeds a specified amount." *Id.* And third, the duties test "focuses on the nature of the employee's job responsibilities." *Id.* (citing 29 C.F.R. § 541.100(a)).

Thus, to prevail on its motion for summary judgment, Walbridge must demonstrate that Gray was (1) "compensated on a salary fee basis of not less than $684 per week [under the salary level and bases tests; and under the duties test,] (2) …[had as his] primary duty the performance of office or non-manual work directly related to the management or general business operations…; [and] (3) …[had his] primary duty include the exercise of discretion and independent judgment with respect to matters of significance." *Tooker*, 715 F. Supp. 3d at 1028 (quoting 29 C.F.R. § 541.200) (cleaned up).

The parties do not dispute that Gray's compensation satisfied the salary level test because he was compensated at least $684 per week. *See Tooker*, 715 F. Supp. 3d at 1028. Therefore, this Court need only address the salary basis and duties tests.[4]

---

[4] Walbridge argues that Gray only contested his classification as a salaried employee, not his duties. ECF No. 81 at PageID.2800, 2802 n. 5, 2803. Although Gray's

## A. Salary Basis

According to Walbridge, Gray had a predetermined annual salary—paid on a biweekly basis—that satisfies the salary-basis test. ECF No. 81 at PageID.2804. But Plaintiff says that Gray was only guaranteed a daily pay rate because his normal workweek exceeded his guaranteed 40 hours, making the guaranteed payrate "auxiliary" to his actual regular pay of 40 hours plus STOT pay. ECF No. 84 at PageID.3300–01. As explained below, there is no dispute of fact that Gray's compensation was a guaranteed, predetermined amount based on an annual salary that comprised the substantial portion of his regular pay.

### 1. Section 602 Exception

"An employer may satisfy the salary-basis test in one of two ways under the regulations," as provided in 29 C.F.R. §§ 541.602 and 541.604(b).[5] *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 580 (6th Cir. 2025) (citing *Helix*, 598 U.S. at 46–47). Under § 602, "[a]n employee will be considered to be paid on a 'salary basis'…if the employee regularly receives each pay period on a weekly, or

---

complaint focused on classification, *see* ECF No. 1 at PageID.2, 5–6, he also alleged that employees who received STOT pay had "primary duties [that were] not management" and did "not include supervising other Walbridge employees." *See also id.* at PageID.7. Thus, for thoroughness, this Court will also address whether Gray's duties satisfy the FLSA exemption.

[5] Because this Court finds that Gray's employment satisfied the salary-basis test under § 602, this Court need not consider the other test under § 604(b).

less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of" differences in the quantity or quality of the employee's performance. 29 C.F.R. § 541.602(a). The "employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.602(a)(1).

Additionally, the employee's "pay may not be docked for time when work is not available, if [the employee] happens to call in sick for a day or two, or if [the employee] takes a few hours off for personal reasons." *Pickens*, 133 F.4th at 581 (internal quotation marks omitted) (quoting 29 C.F.R. § 541.602). In this sense, the FLSA "carves out payments masquerading as a salary but subject to reduction because of variations in the quality or quantity of the worked performed—because such reductions would transform the salary into a *de facto* hourly wage that is anathema to the administrator's independence and discretion." *Venema v. Bode*, No. 1:23-cv-316, 2025 WL 1588678, at *6 (W.D. Mich. June 9, 2025).

Upon review of the record in a light most favorable to Plaintiff, there is no dispute of fact that Gray's compensation satisfied the salary-basis test under the FLSA. *See* 29 C.F.R. § 541.602(a). First, Gray unequivocally stated that he understood he was going to be paid an annual salary of $62,000 a year when he was offered the position. ECF No. 81-2 at PageID.2838. He affirmed that he signed the

- 12 -

offer letter, thereby acknowledging that he agreed with the annual salary offer. *See* ECF Nos. 81-2 at PageID.2838–39; No. 81-8. Gray's statements, offer letter, and pink sheet all reflect Walbridge's contractual commitment to pay Gray a guaranteed annual salary. *See Hughes v. Gulf Interstate Field Servs., Inc.*, 878 F.3d 183, 193 (6th Cir. 2017) (holding that summary judgment is not appropriate if a reasonable trier of fact could conclude that the employee did not receive a guarantee, "[t]he operative idea behind [of which]…is in this context that the employer is contractually obligated not to change its mind and reduce whatever amount it previously determined to provide").

Furthermore, Gray's pay stubs and timesheets from July 2020 onward show that Walbridge honored that guarantee because Gray received a consistent minimum amount each pay period as a regular and substantial portion of his annual salary. *See* ECF Nos. 81-13 at PageID.3153–62 (showing earnings in 2020); 81-14 at PageID.2344–46, 3250–51, 3253–55, 3257–63, 3265–66 (showing regular 80 hour biweekly pay periods); *see also Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 848 (6th Cir. 2012) (considering what compensation the employee actually received when applying salary-basis test).

Second, with the exception of unpaid personal leaves of absence, there is no dispute in the record that Gray received guaranteed compensation for 40 hours each week. *See* 29 C.F.R. § 541.602(a). For example, Gray affirmed that there were days

- 13 -

when he worked less than eight hours but that he would record eight hours on his timesheet "[a]s a rule." ECF No. 81-2 at PageID.2859–61. Gray also affirmed that there was not a posted schedule requiring him to work specific hours on specific days, but rather his schedule aligned with the demands of his assigned construction projects. *Id.* at PageID.3858–59. Assistant Vice President of HR Christina Collins confirmed these practices, testifying that salaried employees would always be paid for at least eight hours a day: "If [an employee] didn't work or if they worked for a half a day for whatever reason…payroll would apply that difference to their time to make sure they were brought up to 8 hours." ECF No. 81-3 at PageID.2894; *see also id.* at PageID.2901 (affirming that an employee who did "not work for an entire week and [did not] have PTO would [still receive] their prorated weekly amount of salary").

Third, Plaintiff points to only one instance of an allegedly improper deduction: the pay period of September 23 to October 6, 2020, in which Gray reported and was paid for 64 hours instead of his regular 80. ECF Nos. 84 at PageID.3306–07; 8-6 at PageID.3703. But this evidence shows only that Gray reported that he worked 64 hours, not that Walbridge made an improper deduction because of the quantity or quality of Gray's work. *See* 29 C.F.R. § 541.602(a). Instead, the record suggests that this pay period was when Gray took FLMA personal unpaid leave time. *See* ECF Nos. 81-2 at PageID.2864 (confirming that Gray was

"out on FLMA" on his "time report for the period September 29, 2021...through February 22 of 2022"); ECF No. 81-7 at PageID.3087 (confirming that Gray was not paid his salary while he was on FLMA leave); *see generally* ECF Nos. 81-13; 81-14. He further confirmed that "within the scope of this time period [of September 29, 2021 through February 22, 2022]," he had not put in time that he should have been paid for but was not paid. ECF No. 81-2 at PageID.2864. And even if this were an entry error, this singular instance of Gray receiving less than 80 hours' worth of pay does not flunk the salary-basis test. *See Acs v. Detroit Edison Co.*, 444 F.3d 763, 769–71 (6th Cir. 2006) (holding that 40 time-entry errors over the course of six-and-a-half years did not constitute unlawful deductions under the FLSA because "[w]hen other factors suggest that an employee was paid on a salary basis, a large number of 'payroll shortfalls' does not necessarily preclude an employer from establishing that the amount of the employee's pay was 'predetermined'"); *see also* 29 US.C. § 541.602(b)(1)–(2) ("Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons.").

Plaintiff also argues that Gray was an hourly employee because his pay stubs classified him as hourly and listed the number of hours he worked with an hourly rate. *Id.* at PageID.2840, 2867–69, 2871–72. But as Walbridge's HR executive Collins clarified, the term "hourly" on Gray's pay stubs was for administrative purposes and not because he was actually an hourly employee. ECF No. 81-3 at

- 15 -

PageID.2899. Instead, the evidence shows that Walbridge had a clear "objective intention to pay [Gray] on a salaried basis." *Venema*, 2025 WL 1588678, at *7 (citing 29 C.F.R. § 541.603 ("This section shall not be construed in an unduly technical manner so as to defeat the exemption.")). Additionally, pay stubs showing "an annual salary computed on a biweekly basis" or showing an annual salary computed by an hourly rate are acceptable compensation methods for salaried employees. *See Acs*, 444 F.3d at 768–69; *see also Kelly v. City of Xenia*, No. 3:06cv114, 2009 WL 10679474, at *9–10 (S.D. Ohio Aug. 25, 2009) (finding that there was no dispute of fact that the employee was salaried despite evidence that the employer's pay system "computed the salaries for all its exempt employees utilizing an hourly rate"). Accordingly, despite Plaintiff's contention otherwise, Gray's salary was not subject to improper deductions, and, therefore, qualifies under the § 602 exception. *See Kelly*, 2009 WL 10679474, at *9–10 *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (holding that "unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted"); *see also Kelly*, 2009 WL 10679474, at *9–10. And as explained below, recent precedent does not change the fact that Gray's employment satisfied the salary-basis test under § 602.

## 2. *Weekly Basis Under* Helix *and* Pickens

Pointing to recent precedent under *Helix* and *Pickens*, Plaintiff argues that like the plaintiffs in those cases, Gray was not a salaried employee because his "'weekly guarantee' of 40 hours cover[ed] less than Gray's normal workweek" in which he "averaged nearly 50 hours a week." ECF No. 84 at PageID.3300–01. And because Gray was paid an hourly rate for every hour that he worked over eight hours in a day, this meant that he was effectively "paid based on a fixed hourly rate for hours worked within the normal workweek." ECF No. 84 at PageID.3298 (quoting *Pickens*, 133 F.4th at 584). Walbridge contends that this precedent is not analogous to Gray's position because the employees in *Helix* and *Pickens* did not actually receive a guaranteed weekly minimum and they were required to work eight hours a day. ECF No. 87 at PageID.4023. This Court agrees with Walbridge.

In *Helix*, the United States Supreme Court held that a high-earning employee, Hewitt—whose paycheck was based solely on a daily rate—did not qualify as a salaried employee under the FLSA's exemption. 598 U.S. at 43–44. Specifically, the amount of compensation that Hewitt received depended upon the number of days he worked. *Id.* at 43 (noting that "his paycheck is based solely on a daily rate—so that he receives a certain amount if he works one day in a week, twice as much for two days, three times as much for three, and so on"). Although Hewitt received a paycheck every two weeks, the unit by which his actual pay was calculated was on

a daily rate rather than a weekly rate. *Id.* at 49–53. And because Hewitt's paycheck fluctuated in relation to the number of days he worked, the United States Supreme Court held that he was not salaried on a weekly basis under § 602. *Id.* at 52–54, 61.

Similarly, in *Pickens*, the defendant hired Pickens to be a salaried employee with a guaranteed weekly salary of $800 on the basis of a $100 hourly rate for eight hours a day. 133 F.4th at 578. Pickens received STOT pay at the same $100 hourly rate. *Id.* The Sixth Circuit held that Pickens' weekly salary was "a minor auxiliary" to his overall pay because he averaged working 52 hours a week. *Id.* at 578, 581. Because being paid on a weekly basis meant that an employee is "paid for a regular week's worth of work," the Sixth Circuit held that "the week must serve as a fundamental unit around which the payment is structured" so that the employee receives a weekly salary for the general value of the employee's labor. *Id.* at 581. In contrast, "an employee is not salaried if [the employee] is paid based on a fixed hourly rate for hours worked *within the normal workweek*." *Id.* at 584 (emphasis in original). In other words, Pickens averaging 12 hours of additional work each week could not be "fairly be described as 'additional compensation' to his eight-hourly 'salary' [because his employer] might have *paid* him weekly, but that did not make the arrangement a weekly salary." *Id.* at 583 (emphasis in original).

The key distinction between the employees in these cases and Gray is that Hewitt and Pickens were hired with clear weekly or daily rates to be paid out for

however many hours they worked each week, whereas Gray was hired with a clear annual salary rate—tracked weekly and paid out biweekly—unaffected by the number of hours he actually labored unless the particular project contract permitted overtime pay. *Cf. id.* at 578 with ECF No. 81-8. Although Gray's pay stubs show an hourly rate amount of approximately $41, payroll manager Clark explained that this figure was an after-the-fact calculation that began with his annual salary as the baseline for determining the appropriate STOT rate, ECF No. 81-3 at PageID.2895, which is an acceptable method of computing a salary. *See Kelly*, 2009 WL 10679474, at *9; *see also Acs*, 444 F.3d at 768–69. Gray's annual-salary computation still shows he was entitled to a guaranteed minimum of 40 hours' worth of pay regardless whether he worked more or less than 40 hours, whereas Hewitt's and Pickens's total compensation—not just their overtime—were computed on a fluctuating daily or hourly basis and not a on predetermined minimum. *See* 598 U.S. at 52–54, 61; *see also* 133 F.4th at 585.

Instead, Gray's employment aligns with the plaintiff engineer in *Wilson v. Schlumberg Technology Corporation* who was entitled to a base pay unrelated to the number of hours worked, as opposed to "all of Pickens' pay [being] computed on the same 'hourly basis.'" *Pickens*, 133 F.4th at 585 (citing *Wilson*, 80 F.4th 1170 (10th Cir. 2023)). Indeed, for Gray, his salary was not set by the hourly rate shown in Walbridge's internal system; the hourly rate was instead set by his predetermined

salary, as Assistant Vice President of Human Capital Richard Allen Krout explains: "It's basically math…It's $62,000 divided by…how many work hours [in a year; not using] an hourly billing rate as part of setting the annualized compensation for an employee." ECF No. 81-6 at PageID.3021. Therefore, because the record shows that there "was an agreement to pay a predetermined and fixed salary, unaffected by the precise number of hours actually worked," there is no dispute of fact that Gray was paid on a salary basis. *Venema*, 2025 WL 1588678, at *6.

## B. Primary Duties

Walbridge argues that Gray's duties were primarily administrative because he managed safety compliance at job sites—which involved supervising others' conduct with a high degree of independence and discretion. ECF No. 87 at PageID.4028. Plaintiff asserts that Gray's duties were not administrative because he lacked discretion and "was limited to ensuring Walbridge's policies were followed." ECF No. 84 at PageID.3311–12. Plaintiff also suggests that "Walbridge has no idea what duties Plaintiff actually performed" and points out that Walbridge only provided evidence of the job description. *Id.* This Court finds that there is ample and indisputable evidence of Gray's actual job duties that satisfy this test for exemption.

Under the duties test, (1) an employee's primary duty must be "the performance of office or non-manual work[, (2)] directly related to the management or general business operations of the employer or the employer's customers; and [(3)

the employee's] primary duty [must] include[] the exercise of discretion and independent judgment with respect to matters of significance." *Venema*, 2025 WL 1588678, at *7 (internal quotation marks and citation omitted). To determine an employee's primary duties, courts consider "evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004). The federal regulations define "primary duty" as "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

The relative importance of the exempt duties, the amount of time spent on the exempt duties, the employee's relative autonomy, "and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" all serve as useful factors when considering whether the employee's primary duties are exempt. *See id.* Additionally, courts generally recognize an "administrative-production dichotomy" in which production employees do not qualify as exempt under the FLSA because their jobs are "to generate the product or service the business offers to the public" rather than contribute to running the business itself. *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644 (6th Cir. 2013).

- 21 -

Here, the job description, Gray's testimony, and former safety engineer now Assistant Vice President Michael Palazzola's testimony confirm that a safety engineer's primary duties are non-manual, administrative, and "directly related to the management or general business operations" of Walbridge as a safety-oriented construction-services company. First, although Gray's duties would sometimes take place at job sites, he still worked regularly from a desk, ECF Nos. 81-2 at PageID.2859; 81-6 at PageID.3030, and the duties themselves did not involve the kind of manual labor under the "production" arm of the administrative-production dichotomy. *See* ECF No. 81-6 at PageID.3031; *see also Renfro*, 233 F. Supp. 2d at 1183–86 (finding that nuclear plant "planners" whose duties included inspecting or "walking down" job sites were still non-manual administrative employees even where "walk downs" included climbing ladders or scaffolding).

Second, a plain reading of the job description reveals no production-type duties. *See* ECF No. 81-10; *see also Foster*, 710 F.3d at 644. And Gray affirmed in his deposition testimony that the duties outlined in the job description accurately represented his actual duties. ECF No. 81-2 at PageID.2844–50; *see also Burton v. Appriss, Inc.* 682 F. App'x 423, 427 (6th Cir. 2017) (holding that an employee's primary duties were administrative on the basis the "job description, much of which, as [the plaintiff] admits, accurately describes her actual work duties").

- 22 -

Third, courts have recognized that liaising with or managing customer relations, *i.e.*, "interfacing with customers" as Gray and Palazzola did, ECF Nos. 81-2 at PageID.2847; 81-5 at PageID.2940, is an administrative duty directly related to company management. *See Burton v. Appriss, Inc.* 682 F. App'x 423, 427–28 (6th Cir. 2017). Additionally, Gray and Palazzola described that their actual duties included facilitating orientations for new subcontractor employees, giving recognitions and disciplinary actions for employees, solving complex problems independently, holding meetings, coaching subcontractors, "develop[ing] and implement[ing] emergency response plans, and performing audits, ECF Nos. 81-2 at PageID.2844–50; 81-5 at PageID.2937, 2940, 2942–45, all of which fall squarely under the federal regulations' definition of management:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102; *see also Renfro v. Ind. Mich. Power Co.*, 2333 F. Supp. 2d 1174, 1184 (W.D. Mich. 2002). The relative importance of Gray's managerial duties, compared to other types of duties, is evident by the fact that if he—as sometimes the sole safety engineer on a project—failed to perform these duties, Walbridge's essential service of providing safe construction sites would be thwarted. *See Thomas v. Speedway v. SuperAmerica, LLC*, 506 F.3d 496, 505 (6th Cir. 2007) (holding that an employee's primary duty was managerial because the store would not function at all if she failed to perform them). Thus, Gray's primary duties were non-manual and administrative. *See Venema*, 2025 WL 1588678, at *7.

Gray's primary duties also involved independent judgment and discretion about job-site issues and subcontractor employees. *See Thomas*, 506 F.3d at 506 (considering the regularity or prevalence of an employee's discretionary decisions). To evaluate the independent or discretionary nature of a job, courts consider "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree." *Tooker*, 715 F. Supp. 3d 1022, 1030–31 (internal quotation marks and citation omitted).

Here, Gray had the authority to develop emergency response plans for projects, facilitate orientations, address workplace incidents, and manage

subcontractor employees. ECF No. 81-2 at PageID.2844–46. For example, Gray acknowledged that it was his decision to determine whether a subcontractor employee's engagement with orientation was sufficient to permit the employee to work on a job site. *Id.* at PageID.2845–46. He also independently facilitated the orientations and weekly safety meetings, both of which were essential for Walbridge's operations. *See id.* at PageID.2845–47 (noting that "usually" it would be "fair to say that safety predominated over all other considerations on the job site"); *see also Tooker*, 715 F. Supp. 3d at 1031. In addition, Gray's approval on "Pre-Task Analyses"—"a breakdown of the steps in each major feature of work, the potential hazards, the hazard solutions, and what to do if an incident were to occur"—in consideration of Walbridge's safety manual, was essential for Walbridge projects to proceed. *See id.*; *see also* ECF No. 81-2 at PageID.2848–49.

Although Gray reported to upper-level supervisors, *see* ECF No. 81-2 at PageID.2843, "active supervision and periodic visits by a [district] manager do not eliminate the day-to-day discretion of the on-site…manager." *Thomas*, 506 F.3d at 506–07 (internal quotation marks and citation omitted). Instead, Gray was sometimes the only safety engineer on projects or job sites, meaning that on a day-to-day basis, he was relatively free from supervision. *Id.* at 507.

Plaintiff argues that Gray did not have discretion because he was required to apply Walbridge's policies, but employees may still qualify as bona fide

administrative employees even if they are beholden to company and regulatory policies. *See Renfro*, 233 F. Supp. 2d at 1187. This is especially true for employees whose duties include preemptive decision-making about how work will occur in the future. *See id.* For example, in *Renfro v. Indiana Michigan Power Company*, the district court found that nuclear power planners qualified under the administrative exemption because they were "not simply determining whether work which [had] already been done [fell] within particular guidelines; instead; their decisions play[ed] a critical role in determining how [the employer's] resources [would] be committed *before that work [had] even begun.*" *Id.* (emphasis in original). Similarly, Gray's final approval on Pre-Task Analyses and his duty to "[d]evelop and implement emergency response plans" for each job site, ECF No. 81-2 at PageID.2844, 2848–49, demonstrate preemptive decision-making amidst implementing Walbridge's policies. *See id.* Thus, Gray's discretion being circumscribed by his supervisor and by Walbridge's standardized operating procedures does not alter the fact that he "*daily* exercised discretion over matters vital to the success of [his] station." *Id.*

In sum, there is no dispute of fact that Gray's employment satisfies the salary level and basis tests since Gray received a guaranteed annual salary reflective of his regular work, and his employment satisfies the duties test because Gray's duties were administrative in nature and directly impacted Walbridge's operations. For these reasons, Walbridge's motion for summary judgment will be granted.

### C. Notice of Collective Action

Plaintiff also moved for judicially approved notice of this potential collective action to alert other "similarly situated" employees that they could "opt in" to his lawsuit. ECF No. 77. To access relief under the FLSA through an action for unpaid overtime pay, "[s]imilarly situated persons are permitted to 'opt into' the suit," known as a "collective action." *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580–81 (6th Cir. 2014) (internal quotation marks and citation omitted). But because this Court has found on the merits that this lawsuit will be dismissed, Plaintiff lacks a viable claim to represent other "similarly situated" employees. *See Wilcox v. Hearn Indus. Servs. Inc.*, No. 2:24-CV-10229-TGB-CI, 2025 WL 2601520, at \*6 (E.D. Mich. Sept. 8, 2025) (citing *In re Fam. Dollar FLSA Litig.*, 637 F.3d 508, 519 (4th Cir. 2011) ("Because we have affirmed summary judgment dismissing [plaintiff's FLSA] complaint on the merits, we need not address whether the district court properly refused to certify her action as a collective action. Without a viable claim, [plaintiff] cannot represent others whom she alleged were similarly situated.")). Therefore, the motion for court-supervised notice will also be dismissed. *See id.*

### IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 81, is **GRANTED**. Plaintiff's Complaint, ECF No. 1, is therefore **DISMISSED WITH PREJUDICE.**

Further, it is **ORDERED** that Plaintiff's Motion for Court-Supervised Notice,

ECF No. 77, is **DENIED**.

**IT IS SO ORDERED.**

**This is a final order closes the above-captioned case**.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge


Dated: January 15, 2026

- 28 -